**MINNESOTA MINING & MANUFACTURING COMPANY, a Delaware corporation, Plaintiff,**

**v.**

**DITTO, INCORPORATED, a Delaware corporation, Defendant.**

**No. 4–60 Civ. 60.**

United States District Court
D. Minnesota,
Fourth Division.
March 16, 1962.

William H. Abbott, St. Paul, Minn. (Edward A. Haight and John W. Hofeldt, Chicago, Ill., of counsel), for plaintiff.

James P. Hume and James M. Wetzel, of Byron, Hume, Groen & Clement, Chicago, Ill., and Paul J. McGough, Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

This action came before the Court for trial without a jury.

Plaintiff is the assignee of Patent 2,740,896, issued to Carl S. Miller on April 3, 1956. The application was filed May 10, 1947. Plaintiff claims that defendant has contributed to the infringement of this patent and, by its activities in selling a machine called Masterfax, has induced others to infringe.

The inventor, Carl S. Miller, first experimented when he was a student some twenty years ago with a method of copying a printed page other than by longhand or typewriting. In considering a way in which he could copy a printed or typewritten page, he recognized at the outset that, in that the portion to be copied is black and the page is white, the graphic image would absorb light and the white page would reflect light. Initially, he took an ordinary piece of cellophane sheet and coated it with certain chemicals so as to make it sensitive to heat. He utilized the then heat-sensitive cellophane sheet by wrapping it around an ordinary cylindrical cardboard and then over the sensitized sheet he placed a 2 by 2 inch printed page, and by tightly wrapping these two sheets together by means of adhesive tape and with application of heat by the use of a 1,000 watt photo flood bulb, he was able in two or three seconds to obtain an impression of the printed page on the heat-sensitized sheet. Obviously, this experiment was very crude and of no commercial value, but it confirmed his belief as to his ability to make a heat pattern of a graphic original with a heat-sensitive sheet which would respond to that pattern. After a lapse of any further development during World War II, Miller in about 1944 to 1947 conducted further experiments in devising the use of an infrared light of adequate intensity and design. Others worked on the type of a machine which could be utilized in the production of copies of printed or typewritten sheets by his method.

The machine ultimately built and marketed by plaintiff is called the Thermofax. It is used for making copies of graphic materials such as letters, printed articles, etc. This method of producing copies of graphic materials with the use of a Thermofax machine has had wide acceptance and provides a marked improvement over the former methods employed in making copies of various typewritten and printed material. Plaintiff markets not only the machine Thermofax, but the heat-sensitive copying materials which are to be used with the machine. The defendant, Ditto, manufactures a machine which it calls Masterfax. It is the marketing of this machine and the copying materials devised by defendant to be used therewith which constitutes plaintiff's basis for its claim of infringement. The patent in suit, however, covers only the process of using heat-sensitive copying paper for producing copies of graphic materials. Neither the heat-sensitive paper nor the machine is involved in this suit; that is, it is the process reflected in the patent for making copies of a graphic original which is the subject of the patent in suit. Plaintiff in effect charges Ditto with intentionally inducing infringement of plaintiff's patent by the acts of supplying machines and materials which when used according to Ditto's instructions, allegedly infringe the process patent in suit. The Masterfax machine is similar to the Thermofax, but defendant contends that there is a total lack of identity between the process employed by Masterfax and that covered by the patent in suit. Ditto denies the validity of the patent and denies that it infringes, and alleges a

defense based on file wrapper estoppel. Furthermore, it seeks a declaratory judgment of invalidity and noninfringement.

The inventor entitles his patent "Method of Using Heat Sensitive Copying Paper." The specifications commence with the following:

"This invention relates to a method for the reproduction of printed matter or the like, and to novel sheet material useful therein. The method involves the application of intense radiant energy to the graphic subject-matter of which a copy is desired, the conversion of radiant energy to heat energy in a pattern determined by such subject-matter, and the formation of visible copy in the sensitized sheet material as a result of the localized heating thus obtained.

"The invention has particular utility in affording a means for rapidly obtaining one or more copies of printed matter, diagrams, photographs, or other graphic subject-matter directly from the original, as in conducting library searches or the like. There is involved merely the proper positioning of the sensitive copy-paper with respect to the original, and the exposure of the original to intense radiant energy. A true copy is produced directly, without the necessity of subsequent development of a latent image or of other processing.

"Radiant energy of an intensity sufficient for the process of this invention may be obtained from any suitable source. One convenient source of radiation, which has given good results over limited areas, consists of a standard 500-watt infrared bulb with internal reflector, operated under overload conditions of 800 watts input, and at a distance of about three inches from the printed surface. Photo-flash bulbs may be used for irradiating small areas. Other sources having a still higher output of radiant energy, particularly at wave-lengths of less than about 25,000 angstroms, and capable of uniformly irradiating larger areas, are even more suitable.

"My novel sensitized sheet material or copying-paper consists of a transparent sheet material carrying a heat-sensitive composition capable of undergoing irreversible visible change when momentarily heated to a predetermined temperature."

Claims 1, 2, 3, 4 and 9 of the patent are alleged to be infringed. Claim 1 may be cited as representative:

"A method for the production of permanent facsimile copies of a graphic original having a pattern consisting of portions highly absorptive of radiant energy, said radiant energy on absorption thereby being converted to heat energy, and other portions sufficiently less absorptive of said radiant energy so that, on irradiation of said original as hereinafter provided, only the said highly absorptive portions will attain a temperature sufficient to cause a visible change in an associated heat-sensitive copying-surface; said method comprising: (a) placing said graphic original in heat-conductive association with a heat-sensitive copying-surface which changes visibly when heated, and (b) strongly and briefly exposing said graphic original to said radiant energy to provide thereon an elevated-temperature pattern corresponding to the absorptive portions of said graphic original and of an intensity adequate to cause a visible change in said associated copying-surface."

In support of its claim of invalidity of the patent, defendant relies primarily upon the disclosures in three printed publications, none of which was cited as a reference by the Patent Office:

(a). "The Photographic News", Vol. II, No. 39, June 3, 1849, "Thermography—Calorific Radiations Considered as a Means of Producing Images on Sensitive Paper," by M. Niepce De St. Victor, appearing on pages 145 and 146;

(b). "Thermography", dated June 10, 1849, on page 159 of the St. Victor publication;

(c). "The London, Edinburgh, and Dublin Philosophical Magazine and Journal of Science," Vol. XVII, July–December 1840, Item XXIX, "On the Use of Hydriodic Salts as Photographic Agents" by Mr. Robert Hunt, on pages 202–211 and 260–268.

The statutes on which defendant relies read:

"The following shall be defenses in any action involving the validity * * * of a patent * * *:

* * * * * *

"(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability, * *." (35 U.S.C. § 282).

"A person shall be entitled to a patent unless—

* * * * * *

"(b) the invention was * * * described in a printed publication in this or a foreign country * * *, more than one year prior to the date of the application for patent in the United States, * * *." (35 U.S.C. § 102(b)).

In considering the anticipatory publications on which the defendant relies, it is necessary to consider the claims in the Miller patent, which involve three major steps: (1) A graphic original is placed in close contact with a heat-sensitive sheet of the kind and type which will change color when subjected to heat; (2) the two sheets when in close contact will be exposed to radiant energy; and (3) when the sheets are separated, there will appear a facsimile of the graphic original on the heat-sensitive sheet. That in essence is the teaching of Miller in his patent claim. Miller makes no restriction as to the source of radiant energy. His process includes all means of radiant heat.

St. Victor, as disclosed in his articles, used three sensitive sheets, one coated with silver nitrate-gold chloride, one coated with potassium cyanide, and one coated with nitric acid. Each of these sheets will attain a color change when exposed to heat. He used, among others, a graphic sheet having characters printed with printing ink. In his experiments, as disclosed in his articles, he placed the heat-sensitive sheet in contact with the graphic original and upon exposing the pair of sheets to the heat which radiated from a hot plate in contact with boiling hot water, obtained a positive copy of the graphic original. A differential heat pattern was produced by St. Victor by this method, and unquestionably the phenomena was the result of the higher temperatures of the printed characters being produced on the heat-sensitized paper because this graphic material was of higher temperature than the surrounding light areas on the printed page. The experiments at the trial which were produced before the Court using the exact method described by St. Victor can leave no doubt as to the verity of the teachings of St. Victor's paper in this regard. But plaintiff seriously challenges the contention that the patent claims are anticipated by the teachings of St. Victor. It contends that St. Victor was merely dealing with chemical reactions and spoke in his paper of certain bodies which give off rays which would impress themselves on other bodies, and disclosed that by placing the heat-sensitive paper several millimeters from the graphic original, copies could be produced. Other examples of his experiments were recited, such as producing an image of printed material when placed between two pieces of glass and then heated, and if the glass plate was reheated and placed in contact with the sensitized paper, a second copy would be produced. However, notwithstanding that St. Victor may not have fully understood all of the scientific reasons for that which he did, and granted there may be inconsistencies in his paper, it seems undeniable that he did conceive that calorific rays, as he termed them, would be absorbed by the dark areas of a graphic original page to produce a differential

heat pattern on a sensitized sheet when the two sheets were in close association with each other. He recognized when unsuccessfully experimenting with the attempt to obtain impressions of an image in the focus of a lens which he assumed "would concentrate the calorific rays emanating from a heated body" that "direct radiation without the intervention of any medium is an indispensable condition of success under certain circumstances." And in referring in his article to comments of others regarding his experiments, he recited the statement of one of his commentators as follows:

"Having prepared a paper with nitrate of silver and chloride of gold, M. Niepce placed a negative upon it, and inclosed the whole in a frame and submitted it to the action of heat. We have before us pictures obtained by these means."

It is true that St. Victor speaks of his experiments as being an extension of those of Moser, Knorr, and Draper, who may have been laboring under some theory that vapors emanating from heated objects played a part in the phenomena, but at all times St. Victor recognized that, if the temperature is sufficiently elevated, "the action of the calorific radiations preponderates," and his article commenced with the following:

"The experiments which I am about to describe are an extension of those of Moser, Knorr, and Draper. I believe I have added to those facts which are already known, a large number of new and interesting facts of such a nature as to throw some light on this class of phenomenon. If on a plate of metal heated by contact with boiling water, there be placed first an engraving, or a sheet having characters printed on it in printing ink, and over that a sheet of paper prepared first with nitrate of silver and then with chloride of gold, a violet blue impression is obtained of the *dark* parts of the engraving, or printed letters."

In other words, it is the printed characters on the graphic original which obtain the higher temperature in St. Victor's process, just as in the Miller process, and the color change which is produced on the sensitive sheet occurs at the areas of higher temperature.

It is undoubtedly true that the amount of radiant energy produced by a plate heated by boiling water is not sufficient to produce an effective temperature differential pattern which will effectively produce a number of copies, but that fact does not establish that St. Victor's experiments merely reflect some chemical changes. The teachings of the patent in suit call for a temperature even below boiling point, to wit, 122 degrees F.

That St. Victor was cognizant that his results were those of temperature differentials is strongly evidenced when he stated that

"If a piece of paper, on which is traced a design in lampblack, or even in wood charcoal, is heated to a temperature sufficiently high to char the paper, it will be noted on the *back* that those parts which correspond to the dark parts, are more carbonised than those which correspond to the light parts. A similar effect may be observed with the blacks and whites of a variegated feather or a differently coloured fabric. If during the heating of the coloured fabric, it be kept in contact with paper impregnated with cyanide of potassium, the dark parts would impress themselves more strongly than the light parts."

Experiments in court were made, and when employing St. Victor's process in using, in addition to the ordinary printing on a newspaper, a black crayon mark, the print was reproduced by St. Victor's method, but the crayon mark was not. However, when the sensitized sheet and this graphic original were put through plaintiff's Thermofax machine, not only the print but the crayon mark was produced. But this comparison of the efficiency of the intense radiant energy created in a Thermofax machine, as compared with the elementary St. Victor method, only tends to emphasize the dif-

ferences in the heat-absorptive qualities of graphic material and the effect of higher heat intensity with respect thereto. It must, of course, be recognized that whatever St. Victor may have taught in his printed publication made no commercial contribution to the art and lay dormant over 100 years before anyone assumed to follow the process of using heat-sensitive paper for copying graphic materials with the application of intense radiant energy. However, the long delay in utilizing that which St. Victor taught, depended, in part at least, upon the available sources of heat energy to be installed in a suitable machine which was adapted to provide the mechanical and electrical efficiency necessary. In fact, the type of radiation for the Thermofax machine was a matter that was not completed until some years after Miller had completed his process. The elliptical reflector and the straight-line filament bulb which plaintiff built in its machine was undoubtedly a significant contribution to the marketability of the process which was the basis of the patent herein.

Concededly, that which St. Victor taught must be considered in light of the situation which then existed and not in light of Miller. But that principle will not justify the characterization of St. Victor as one who was using the term "calorific radiations" with no knowledge of the meaning of radiant energy. When St. Victor states that, if the image was not sufficiently distinct by his method, it could be forced out by exposing the sheet of sensitive paper to the radiant heat from the fire, he was not referring to any chemical reactions. The difficulty is not the tendency to interpret St. Victor's teachings in light of the continuation thereof made by Miller; rather, the difficulty arises to keep clearly in mind that the Masterfax machine, with its high heat intensity and mechanical perfection for producing copies on heat-sensitive paper, is not a part of the patent issued to Miller. Moreover, the perfected heat-sensitive paper, which now is used by the plaintiff, is not covered by the Miller patent.

There has been considerable testimony as to the inability of St. Victor to obtain any radiant energy which could be converted to heat energy by the heating of a metal plate over boiling water which at its ultimate would not be over 212 degrees. But the relatively small amount of radiant energy produced at 212 degrees merely resulted in a longer period for the lower temperature to effect the temperature differential pattern. And Miller in his specifications speaks of "sensitizing compositions" which provide a visible change at "a temperature of somewhat less than about 150 degrees C., or even as low as about 50–60 degrees C." And St. Victor recognized that certain heat-sensitive paper required a higher temperature than 212 degrees to yield "thermographic images."

Plaintiff's testimony that St. Victor was not using the words "calorific rays" in the same sense that the term now is used is not convincing. St. Victor entitled his paper "Thermography—Calorific Radiations Considered as a Means of Producing Images on Sensitive Paper." Moreover, reference may be made to Hunt's article which clearly indicates that as early as 1840, Hunt obtained positive images by exposing a graphic original and an associated sensitive sheet to sunlight filtered through a red glass. In his article of that year entitled "On the Use of Hydriodic Salts as Photographic Agents," he stated,

"73. * * * A careful examination of the photographs formed under the before-mentioned glasses, particularly under red glass, convinced me that the quickening agent was to be sought for in the calorific rays, which are absorbed and retained with greater force by the dark parts of the engraving.

"74. To put this notion to the test, I placed a printed page in contact with a paper wetted with an iodidated solution, over which I placed a glass, and then a plate of copper, which I made hot by rubbing it with a heated iron. The passage of the heat through the glass was

sufficient to effect as fair a copy as is produced under the red glass by the influence of light.

"75. These researches, which were pursued with a view alone to an explanation of the peculiar mode of operation exhibited by the hydriodic salts on different preparations of silver under the influence of light, have thus opened a new and unexpected field of interesting inquiry, which may possibly end in the establishment of the new art of Thermography." (pp. 267–268).

It is evident that Hunt was using the term "calorific rays" in its present understanding and usage. And he used a graphic original and a heat-sensitive sheet to produce a positive copy of the original by exposing them to radiant heat. It may be noted that the articles of St. Victor and Hunt were available in this country as printed publications more than one year prior to May 10, 1947, the filing date of the patent in suit.

Regardless of the fact that it may be urged that St. Victor may not have fully understood the theory underlying his process, we cannot escape the impelling fact that he taught the following: If a graphic original is placed in close association or contact with a heat-sensitive sheet and radiant energy is applied, the characters on the graphic original will be produced on the heat-sensitive sheet. One cannot escape the fact that, with the knowledge of the teachings of St. Victor, the process taught by Miller would be obvious to one who is skilled in the art, and to stress the claimed lack of knowledge of St. Victor of the phenomena which he unquestionably produced, evades the basic question before the Court. As long as St. Victor gave to the scientific world full information in a printed publication as to that which he did and stated therein that which resulted, it must follow that, if his published process anticipates Miller, the patent herein is invalid under the statute. See Smith v. Hall, 301 U.S. 216, 226, 57 S. Ct. 711, 81 L.Ed. 1049; DeForest Radio Co. v. General Electric, 283 U.S. 664, 686, 51 S.Ct. 563, 75 L.Ed. 1339, in which the court stated,

"Whether DeForest knew the scientific explanation of it is unimportant, since he did know and use the device and employed the methods, which produced the desired results, and which are the device and methods of the patent."

If the St. Victor and Hunt articles and the prior art cited by the Patent Office had been under consideration by that office, there can be no real doubt that the Miller method of using heat-sensitive paper would not have been considered patentable.

It follows from the foregoing that defendant is entitled to a finding that the patent in suit is invalid. In view of this finding, the Court does not find it necessary to discuss the question of infringement and the alleged file wrapper estoppel. Findings of fact and conclusions of law may be presented by the defendant on ten days' notice. An exception is reserved.